

**SO ORDERED.**

**SIGNED this 16th day of February, 2012.**



Robert E. Nugent
United States Chief Bankruptcy Judge

DESIGNATED FOR ON-LINE PUBLICATION
BUT NOT PRINT PUBLICATION

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

IN RE:

TIMOTHY JOHN MALONE, II                Case No. 10-11517
PATTIE LEE MALONE,                     Chapter 7

        Debtors.

_____

GEOFFREY TAMMEN,

        Plaintiff,

v.                                     Adversary No. 10-5190

TIMOTHY JOHN MALONE, II
PATTIE LEE MALONE,

        Defendants.

_____

## MEMORANDUM OPINION

When a borrower promises a lender that his mortgage will be "in second position to 1st mortgage" and the mortgage turns out to be in ninth place, should the debt secured by the "second"

1

be excepted from his discharge under § 523(a)(2)(A)? It should if the lender's reliance on the borrower's statement was "justifiable." Whether Geoff Tammen's reliance was justifiable is the bottom line in this very close case and must be proved by a preponderance of the evidence. Considering all the circumstances, the Court concludes Tammen's reliance on Malone's representation was justified.[1]

Findings of Fact

Defendant Timothy Malone was a real estate developer whose fortunes ran afoul of the 2008 financial crisis. Malone conducted his real estate development business personally and through Castle Development, L.L.C., of which he was the sole member. Up until 2008, he had successfully developed several residential and commercial projects in the Wichita, Kansas area. When he had an opportunity to acquire raw land in the Junction City area in early 2007 for what seemed a nominal price, he took it, purchasing 160 acres in Geary County. At that time, many developers were flocking to Junction City, near the Fort Riley army base, hoping to leverage the location's proximity to the base and to Kansas State University. The anticipated "base realignment" suggested that thousands of service personnel would be relocating to the Junction City area. Castle paid $730,000 for this property with a purchase loan from Legacy Bank and granted a mortgage on the property.[2] Malone intended to develop a mixed-use project that would contain single- and multi-family homes, recreation areas, and a shopping center. Junction City would annex the property which was adjacent to a state highway and the construction of off-ramps would be financed by STAR bonds to be issued by the state of Kansas.[3] Malone prepared a

---

[1] This proceeding to except Malone's debt to Tammen from discharge under § 523(a)(2)(A) is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which this Court has subject matter jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(1). At the trial of this adversary proceeding, plaintiff was represented by David Arst. Defendants Malone were represented by Michael Studtmann.

[2] Ex. 1, Mortgage dated and recorded January 25, 2007.

[3] STAR bonds are bonds issued by the state to finance infrastructure development and paid for by property taxes levied on the benefitted adjacent areas.

2

draft plat and obtained an appraisal from Robert Taggart that projected an as-built value for the development of $7.2 million. Needing commercial sites, Malone bought more surrounding land and again financed the land acquisition with Legacy for $100,955, secured by a mortgage on the original 160 acre Geary tract.[4]

But this was not Malone's only deal. His Wichita area projects required cash, too, and he secured some of that by borrowing against the Geary tract. He borrowed $95,000 from his business associate Jean Evers,[5] $250,000 from United Building Centers,[6] $55,000 from Mohammad Aghakhani,[7] $110,000 from Kansas Carpet & Tile for materials used in all his operations,[8] another $68,000 from Legacy,[9] and $104,375 from his engineers, Ruggles & Bohm, P.A. for expense incurred in site planning the Geary development.[10] All of these borrowings were secured with mortgages on the Geary tract and, by May of 2008, there were no fewer than eight mortgages on the property, totaling about $1.5 million.[11]

Around that time, Jean Evers connected Malone with Geoff Tammen. Evers had worked with Malone since 2005, as a real estate broker selling new homes built by Malone, obtaining investors for Malone's projects, and personally investing in Malone projects, including the Geary development.

---

[4] Ex. 3, Mortgage dated February 14, 2007 and recorded February 20, 2007.

[5] Ex. 2, Mortgage dated January 27, 2007 and recorded October 30, 2007.

[6] Ex. 4, Mortgage dated April 12, 2007 and recorded May 11, 2007.

[7] Ex. 5, Mortgage dated April 15, 2007 and recorded January 8, 2008.

[8] Ex. 6, Mortgage dated January 8, 2008 and recorded April 4, 2008.

[9] Ex. 7, Mortgage dated February 19, 2008 and recorded March 13, 2008.

[10] Ex. 8, Mortgage dated May 12, 2008 and recorded May 13, 2008.

[11] The order of priority of these 8 mortgages, based upon the filing date, is: (1) Legacy; (2) Legacy; (3) United Building Centers; (4) Evers; (5) Aghakhani; (6) Legacy; (7) Kansas Carpet & Tile; and (8) Ruggles & Bohm.

Tammen and Ms. Evers' late husband had been friends. Malone needed money, both to continue the Geary development, but also to fund his Wichita operations. At Jean's urging, Tammen met with Malone. Tammen is a farmer from Great Bend and was a real estate agent dealing in agricultural land for about twenty years; he was last active as a broker in the early 1990's. He has invested in real estate and oil and gas over the years, but not as a developer. When Tammen met with Evers and Malone, Malone told him he could expect a good return and that he would be in and out of this "investment" quickly. Malone showed him the Taggart as-built appraisal[12] and told Tammen that he was seeking STAR bonds to complete the highway interchange near the project. Malone says he told Tammen he needed money for all of his operations, including the Geary development, but Tammen says he was told the funds would be put into the Geary project exclusively.

Tammen did not inspect the Geary site or examine the title. Tammen testified that he was satisfied with Malone's assurance that he would receive a second mortgage and a life insurance assignment as security. Only when Legacy foreclosed its first mortgage a year later did Tammen realize that his "second mortgage" was in fact a ninth priority lien. And, by June of 2009, the financial crisis was in full swing making this and many similar ventures in Geary County much less valuable.

On June 12, 2008, Castle Development, L.L.C., Malone, his wife, and Evers made a promissory note to Tammen for $900,000, to be payable "upon demand . . . with 45 day notice, but not before January 2, 2010."[13] A $50,000 interest payment would be payable on January 2, 2009. The note was to draw interest at 22.2% per annum. It was secured by a mortgage of even date covering the Northwest Quarter of Section 17, township 12 South, Range 5 East of the Sixth P.M. in Geary County. In addition, the note contained the following statement–

---

[12] Ex. 13.

[13] Ex. 10.

4

> Lender understand [sic] that the Mortgage will be in second position to 1st Mortgage with Legacy Bank with an approximate balance of $840,000. Promisor agrees to keep said 1st mortgage paid current.[14]

Malone signed the corresponding mortgage as managing member of Castle Development, LLC.[15] He also assigned Tammen an interest in a life insurance policy.[16] Malone drafted the Tammen note and mortgage.

Malone says that what he meant by the "second mortgage" representation was that he would shortly retire all of the obligations senior to Tammen's, eventually making Tammen's lien a second mortgage. He says the word "will" connotes the prospective nature of this commitment. But Tammen understandably took it that his mortgage would be subordinate only to the first mortgage because this language admits of more than one meaning.[17] Instead of meaning what Malone says he intended, the clause could easily be interpreted by a lay reader like Tammen to mean that his would be in a second position upon its execution and recording. That interpretation would signal the existence of Legacy's first mortgage and make clear that Tammen would not have a first mortgage. Another meaning might be that Malone intended to utilize Tammen's loan proceeds to pay off the senior obligations and thereby elevate Tammen immediately to a second position. He didn't.

---

[14] *Id.* Given the $840,000 dollar amount, it is apparent that Malone was including the first two mortgages given to Legacy in 2007 ($730,000 + $100,955) as being ahead of Tammen.

[15] Ex. 9, Mortgage dated June 12, 2008 and recorded June 23, 2008.

[16] Ex. 11.

[17] If the language of an instrument is susceptible to more than one interpretation, it is ambiguous. *See Metropolitan Life Ins. Co. v. Strnad,* 255 Kan. 657, 876 P.2d 1362 (1994) (Notes and mortgages are contracts between parties and the rules of contract interpretation and construction apply; if the language is clear, there is no room to apply the rules of contract construction and effect must be given to the intent of the parties as expressed in the four corners of the instrument.); *Stauth v. Brown,* 241 Kan. 1, 9, 734 P.2d 1063 (1987) (Contract is ambiguous when words used to express meaning and intention of parties are insufficient in sense that contract may be understood to reach two or more possible meanings).

Because the language is ambiguous, the rules of construction permit the Court to construe it against Malone because he drafted it.[18] But I need not rely upon this rule of construction to find that the omission of any reference to the other seven intervening liens in the note or mortgage and the lack of any evidence that Malone ever disclosed these senior liens to Tammen amounted to a representation by Malone that Tammen's lien would be a second lien when he received it.[19] Malone's co-maker Evers testified that she "had the impression" that there were other creditors to be taken care of before Tammen would be in second position, but even if that were true, Tammen could have heard that representation as an assurance that Malone would pay off the senior lienholders with the loan proceeds, elevating Tammen to second place.[20]

Malone failed to make the January, 2009 interest payment due Tammen. His life insurance premiums lapsed and, in June, Legacy foreclosed on the Geary County tract.[21] It was only then that Tammen learned that there were seven intervening liens between Legacy's and his own. By then, the

---

[18] *See Metropolitan Life Ins. Co., supra* at 662. (When the terms of a contract are ambiguous, the terms may be construed against the drafter of the instrument).

[19] There was no evidence presented that at the time of making the Tammen note and mortgage, Malone disclosed the existence of the other mortgages against the Geary property or the total amount of debt against the Geary property. There is nothing in the evidentiary record from which the Court can conclude that Tammen was aware of any other "investors" in the Geary project. *See First Nat. Bank of Olathe v. Clark,* 226 Kan. 619, 623-24, 602 P.2d 1299 (1979) (Rule that ambiguities within note are construed against preparer should be applied only where note is still ambiguous after the ordinary rules of construction have been applied, including consideration of extrinsic evidence of prior and contemporaneous circumstances surrounding the execution of the note to explain the ambiguity and clarify the parties' intent.)

[20] Of course, Evers knew at a minimum that she was a lienholder ahead of Tammen, having obtained her $95,000 mortgage in 2007. *See* Ex. 2. At trial, Evers denied having knowledge of the other mortgages against the Geary property.

[21] It appears that the Evers' mortgage was not foreclosed. *See* Ex. L. According to Evers, Malone paid her $90,000 from Tammen's loan proceeds and she released her mortgage prior to the foreclosure. No documentary evidence of the mortgage release was offered at trial.

property was far less valuable. Evers and Tammen concluded there was insufficient equity to warrant them participating in the foreclosure proceedings and Legacy bought the tract at sheriff's sale. It was later resold to the bank's president for $218,000. Malone filed his bankruptcy case in May of 2010 and Tammen filed this adversary proceeding.

Analysis and Conclusions of Law

Tammen bases his dischargeability complaint on the fraud exception, § 523(a)(2)(A), and two alleged misrepresentations by Malone: (1) that his would be a second mortgage (not a ninth); and (2) that the funds he lent Castle Development would be spent on the Junction City project exclusively.[22] Tammen did not prove the latter representation, but he did demonstrate by a preponderance of the evidence that the first was made.[23] We measure that statement against the stringent requirements of § 523(a)(2)(A) to determine whether it was knowingly false, whether it was made with the intent to deceive Tammen, whether Tammen relied on it to his detriment, and whether that reliance was justifiable.[24]

In describing the then-present state of the title, Malone's statement was patently false and, as he granted the preceding eight mortgages, he knew it. Tammen actually relied on that statement in making Malone the loan and he lost $900,000 plus interest and collection expense as a result. But was Tammen justified in his reliance? This is a close call. In *Field v. Mans,* the Supreme Court held that

---

[22] Tammen has failed to allege or offer evidence that Mrs. Malone made any of the misrepresentations claimed here. In the absence of attribution of the statements to her, Tammen has made no case against her. Accordingly, Mrs. Malone will be granted judgment on the complaint.

[23] *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed. 2d 755 (1991) (Section 523(a)(2)(A) fraud discharge exception is subject to the preponderance of the evidence standard for burden of proof).

[24] *In re Riebesell,* 586 F.3d 782, 789 (10th Cir. 2009); *Fowler Bros. v. Young,* 91 F. 3d 1367, 1374-75 (10th Cir. 1996) (intent to deceive creditor may be inferred from totality of circumstances or from knowingly made false statement and failure to disclose information may be characterized as a misrepresentation for purposes of § 523(a)(2)(A)); *Groetken v. Davis (In re Davis),* 246 B.R. 646, 652 (10th Cir. BAP 2000).

7

"justifiable" rather than "reasonable" reliance is required to carry the day on a § 523(a)(2)(A) complaint, describing the "justifiable reliance" standard as "less demanding."[25] In doing so, the high court looked to the necessary standard of reliance as it existed in the common law in 1978 when § 523(a)(2) was adopted. The Supreme Court settled on the Restatement (Second) of Torts (1976), § 540, which states that "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'"[26] Among the illustrations for this Restatement section is one very similar to the present case. In the illustration, a buyer of land is assured it is free of encumbrances: "according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have 'walk[ed] across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage."[27] The court also noted that justification is "a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case. . . ."[28] Still, as Professor Prosser noted, only where the true facts "should be apparent to one of his knowledge and intelligence from a cursory glance" or "something which should serve as a warning that he is being deceived," is further investigation to discover the falsity required.[29]

What is troubling here is Tammen's former background in buying and selling real estate and his failure to view the premises. He testified that he relied on Malone personally for the repayment, not necessarily the land. One would expect someone with real estate experience to demand a title opinion

---

[25] 516 U.S. 59, 62, 116 S. Ct. 437, 133 L.Ed. 2d 351 (1995).

[26] 516 U.S. at 70.

[27] *Id.*, citing § 540, Illustration 1.

[28] *Id.* at 71, citing Rest. (2d) Torts, § 545A, Comment *b*.

[29] *Id.* at 71-72.

8

before disbursing $900,000. Had he examined the title, Tammen would have found that his lien was nearly $800,000 junior to what he had expected. Even if he had that knowledge, he might still have made the loan given the as-built appraisal of over $7.2 million. Armed with that knowledge, Tammen might have demanded that his loan proceeds be addressed to the liens senior to his own or restricted their use.

On the other hand, Tammen's real estate experience was limited to buying and selling farm ground and nothing in the record suggests that he was experienced in mixed-use development or commercial real estate finance. He had no reason to suspect Malone's financial distress as it never came up in any of their meetings or discussions. No projects were discussed with Tammen other than the Geary development. Other than Tammen's "second mortgage" behind Legacy, Malone did not disclose any other mortgages against the property. With Malone's disclosure of the first mortgage and description of Tammen's as a "second mortgage," Tammen could easily conclude that there were no other mortgages ahead of him. Malone provided no details of how the loan proceeds would be used. Any of these bits of information, had they been provided, might have raised a red flag which, as Prosser writes, "should [have] serve[d] as a warning that he [Tammen] is being deceived" and that would have warranted further investigation.[30] But absent any warning flags gleaned from a "cursory glance," Tammen's obligation to investigate was never triggered. Tammen also received some confidence in transacting business with Malone because it was his friend Evers that introduced him to Malone and even "guaranteed" the note. Evers herself was unaware of all the other mortgages against the Geary property and she had released her own mortgage when Malone paid her $90,000.

To a lawyer, Tammen's lack of inquiry might be fatal to his claim of having been misled. But that is not the measure of "justifiable reliance." In the absence of any apparent facts that would have

---

[30] *Field v. Mans,* 516 U.S. at 71, *quoting* W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971). The earliest visible warning Tammen had that things might be amiss came in January 2009 when the interest payment came due and Malone could not pay it.

9

placed him on inquiry, Tammen was justified in relying upon the specific representations Malone made. Judgment should therefore be entered for the plaintiff and against the defendant Timothy John Malone, excepting Tammen's debt from his discharge. Judgment shall also be entered against plaintiff and for defendant Pattie Lee Malone, the plaintiff having failed to establish any actionable conduct on the part of Mrs. Malone. A Judgment on Decision will issue today.

# # #